1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| JABO JOHNIGAN, | CASE NO. 3-20-cv-05601 RJB |
| Plaintiff, | ORDER ON DEFENDANTS |
| v. | CHRISTOPHER BOHATCH'S AND |
| | SCOTLAND HAMMON'S |
| CITY OF VANCOUVER; CHIEF JAMES | MOTION FOR SUMMARY |
| MCELVAIN, in his official capacity as | JUDGMENT |
| Chief of the Vancouver Police Department, | |
| CHISTOPHER BOHATCH, individually | |
| and as an employee of the Vancouver | |
| Police Department; SCOTLAND | |
| HAMMOND, individually and as an | |
| employee of the Vancouver Police | |
| Department, | |
| Defendants. | |

THIS MATTER comes before the Court on Defendants Christopher Bohatch's and

Scotland Hammond's Motion for Summary Judgment.  Dkt. 24.  The Court has considered the

pleadings filed regarding the motion and the remaining file.

This case arises from Defendant City of Vancouver police officers Christopher Bohatch

and Scotland Hammond's entry into the Plaintiff's apartment and their arrest of the Plaintiff.

Dkt. 1.  The Plaintiff, an African American, makes federal constitutional claims for violations of his fourth, fifth, and fourteenth amendment rights, pursuant to 28 U.S.C. § 1983, against the officers, the City of Vancouver and the Vancouver Chief of Police, James McElvain, in his official capacity.  *Id.*  The Plaintiff also asserts state law claims for nuisance and outrage.  *Id.* The officers now move for summary judgment on the claims asserted against them.  Dkt. 24.  For the reasons provided below, the motion (Dkt. 24) should be granted.

## I.    **FACTS**

In November of 2018, the Plaintiff moved into a two-bedroom apartment at 3412 NE 66th Avenue, Vancouver, Washington.  Dkt. 25-1, at 14.  At the time of this incident, the Plaintiff and Israel Young had a child together.  *Id.*, at 13.  The child lived with the Plaintiff full time.  *Id.* The Plaintiff and Ms. Young state that Ms. Young spent the night at his apartment one or two nights a week.  Dkts. 25-1, at 11 and 20 and 25-2, at 5-6.  Ms. Young also watched their child during the day everyday while the Plaintiff worked.  Dkts. 25-1, at 20-21 and 25-2, at 5.  Ms. Young had access to the entire apartment except the Plaintiff's bedroom.  Dkt. 25-1, at 23.

On December 18, 2018, the Vancouver police department was called to the Plaintiff's residence for a domestic violence incident.  Dkt. 25-1, at 19.  The Plaintiff was the victim in that incident.  Dkt. 25-1, at 40.  Officer Bohatch (a Defendant here) was one of the officers who responded.  Dkt. 27, at 2.  During or after that incident, Officer Bohatch created a police report in which he related that on December 18, 2018, Ms. Young returned to the apartment to pick up her belongings after having been out drinking.  Dkt. 27, at 6.  Ms. Young and the Plaintiff got into a physical altercation.  Dkt. 27, at 6-7.  In his victim statement, which Officer Bohatch read, the Plaintiff told Ms. Young that she "was not welcome at [his] house [that night]."  Dkt. 27, at 9. Officer Bohatch states that Ms. Young "was not referred for burglary charges despite entering

1   the apartment and assaulting [the Plaintiff]" because "there was strong evidence that Ms. Young

2   resided [in the apartment]."  Dkt. 27, at 2. (In an April 30, 2019 victim's interview of the

3   Plaintiff regarding this incident with the prosecuting attorney and Ms. Young's criminal defense

4   lawyer, the Plaintiff acknowledged that "[Ms. Young didn't barge in.  [He] let her into the

5   apartment because [Ms. Young] stays there as well." Dkt. 25-2, at 4).

6         On March 13, 2019, the couple had another disagreement at the apartment.  Dkt. 25-1, at

7   25.  The Plaintiff admits that during this disagreement, he punched the TV, which was in the

8   living room, and broke it.  *Id.*  The Plaintiff states that he did so because Ms. Young turned off

9   the TV while he was playing a video game.  *Id.*, at 26.  The Plaintiff asserts that the couple was

10  fighting because he would not allow her to have a cupcake.  Dkt. 25-1, at 30.

11        Ms. Young called 9-1-1, and a transcript of that call is in the record.  Dkt. 25-3.  Ms.

12  Young told the 9-1-1 operator that wanted to "file a police report that [her] property was

13  damaged."  Dkt. 25-3, at 3.  In response to being asked what happened, Ms. Young replied,

14  "[m]y ex-boyfriend was on my television.  I asked him to get off and he said if I kept turning my

15  TV off, he would damage it.  And so, I turned my TV off and he did what he said."  *Id.,* at 3-4.

16  Ms. Young told the operator that that Plaintiff was still there and that "we share a place

17  together."  *Id.*, at 4.  During this conversation, Ms. Young says, "[c]an you please get away from

18  me?"  *Id.*, at 4.  Ms. Young then describes the Plaintiff, told the operator that "we already have

19  an ongoing case, and he just threatened to call the prosecutor on me for no reason."  *Id.*, at 5.

20  Ms. Young stated that the Plaintiff "drank early but [she's] the only one that's been drinking."

21  *Id.*, at 6.  Ms. Young told the operator that he had not physically attacked her.  *Id.*, at 7.  They

22  were advised to separate from one another until the police arrived.  *Id.*  After Ms. Young called

23  9-1-1, the Plaintiff went to his bedroom and laid down.  Dkt. 25-1, at 27.

24

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR
SUMMARY JUDGMENT - 3

1       Officers Hammond and Bohatch responded to the call.  Dkts. 26, at 2 and 27, at 2.  They

2 reviewed the CAD notes, which indicated that the Plaintiff and Ms. Young "lived together" and

3 that at one point in the call, Ms. Young asked the Plaintiff to "get away from her." Dkts. 26, at 2;

4 27, at 2; and 28, at 6.  Officer Bohatch recalled he'd responded to a domestic violence call at this

5 address three months before where the Plaintiff was the victim.  Dkt. 27, at 2.

6       The Plaintiff made a video recording using his phone, which he maintains recorded

7 everything that he said while recording.  Dkt. 25-1, at 5 and 8.  The recording was submitted to

8 be considered with this motion.  This recording occurs primarily while the Plaintiff is in his

9 bedroom, with a few seconds in the hall. Dkt. 42.  His bedroom is down a hall several feet from

10 the front door.  The Plaintiff's voice is very loud because he is holding the phone, and other

11 voices are more difficult to make out.  At several points, people speak over each other.  It is

12 unclear which of the two police officers are speaking.  A transcript of the video, portions of

13 which are disputed, provides:

14       POLICE OFFICER: Israel?

15       MS. YOUNG: Yes.

16       POLICE OFFICER: Can we come in and talk with you?

17       MS. YOUNG: This is not my – technically my place of residence so I don't have (inaudible) to let you guys in.

18

19       POLICE OFFICER: Okay. Where's Jabo at?

20       MS. YOUNG: He's in his room.

21       POLICE OFFICER: Jabo, can we come in and talk with you, sir?

22       MR. JOHNIGAN: I don't really want to -- feel like talking right now.

23       MS. YOUNG: He doesn't feel like talking.

24

1   POLICE OFFICER: He doesn't feel like talking. Okay. Since you called 911 can
2   we --

    MS. YOUNG: Hold on one moment.
3
    POLICE OFFICER: So, who all lives here then if this technically isn't your
4   apartment?

5   MS. YOUNG: Me and him and our son.

6   MR. JOHNIGAN: And her brother apparently.

7   MS. YOUNG: But he leaves.

8   POLICE OFFICER: That doesn't matter. Do you live here?

9   MR. JOHNIGAN: No, she does not live here.

10  POLICE OFFICER: Jabo, we were out here last winter talking to you both.

11  MS. YOUNG: Let me grab my phone because I have a video of what happened
    and it died.
12
    MR. JOHNIGAN: She does not live here. She doesn't.
13
    POLICE OFFICER: Okay. Do you mind if we come in and talk to you, sir?
14
    MR. JOHNIGAN: I don't really want to talk about it right now. I don't have
15  nothing to talk about.

16  POLICE OFFICER: What's that?

17  MR. JOHNIGAN: I don't have nothing to talk about.  This is really just her
    situation.
18
    MS. YOUNG: He wouldn't turn the TV off and so I notified the police also
19  (inaudible).

20  MR. JOHNIGAN: She doesn't live here so she needs to leave, like she -- I asked
    her nicely to leave. She chose not to leave and take her things.
21
    POLICE OFFICER: If you are not going to come out and talk to us give us
22  (inaudible) please.

23  MR. JOHNIGAN: Okay. Can she step outside my door properly?

24

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR
SUMMARY JUDGMENT - 5

1    MS. YOUNG: I asked him to turn off the TV and he said no.

2    MR. JOHNIGAN: Can you please step outside the door while you talk to them?

3    MS. YOUNG: He said I can't have nothing of my own and I said, oh, really (inaudible).

4
5    MR. JOHNIGAN: I'm asking you nicely, can you please step outside the door while you talk to them?

6    MS. YOUNG: I'm like since you're going to be that way to me, I'll just turn my TV off.

7
8    POLICE OFFICER: If he's using your TV are you guys dating?

    MS. YOUNG: No, we're not married.

9
10    POLICE OFFICER: Not married. Dating? Do you guys have a child in common? You guys are dating?

11    MR. JOHNIGAN: Just a child, just a child.

12    MS. YOUNG: We have a child in common. We are not even together in a relationship anymore.

13
14    POLICE OFFICER: Okay. So, you have a child together and you both stay here so is this like a domestic violence issue?

15    MS. YOUNG: He didn't hit me or touch me or do nothing wrong.

16    MR. JOHNIGAN: I didn't hit nobody. I didn't do nothing.

17    POLICE OFFICER: So, you asked him to turn the TV down?

18    MS. YOUNG: No, I asked (inaudible) --

19    MR. JOHNIGAN: No. She kept harassing - before this even happened she kept harassing me.

20
21    POLICE OFFICER: Jabo, would you like to step out and talk with us?

    MR. JOHNIGAN: No, I don't.

22
23    POLICE OFFICER: Okay. Then –

    MR. JOHNIGAN: I'm just -- I'm just -- I'm going back in here.

24

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR SUMMARY JUDGMENT - 6

1

2     MS. YOUNG: He said if I turned it off that he would punch it. And I said you are
      not going to be disrespectful to me and you know what I will do so if I go home

3     and you are just being disrespectful to me for no reason I will turn my TV off and
      you can't use nothing of mine. All this is because of him.

4     POLICE OFFICER: But you both live here, correct?

5     MR. JOHNIGAN: No.

6     MS. YOUNG: Yes. All my things are here.

7     MR. JOHNIGAN: No, they're not.

8     MS. YOUNG: So, what of mine is not here?

9     MR. JOHNIGAN: Okay. Just your son is here. Thank you.

10    POLICE OFFICER: So, then why are we here then I guess?

11    MS. YOUNG: Because I told him to turn my TV off and he damaged by property
      and he told me—

12

13    POLICE OFFICER: So, can we come in and see that TV then?

14    MR. JOHNIGAN: No, she doesn't live here. She doesn't. She can't -- I did not.

15    POLICE OFFICER: So, she lives here so she has permission?

16    MR. JOHNIGAN: No, she does not live here. She already told you when you
      guys first came she does not live here.

17    POLICE OFFICER: Who's on the lease? Have you established residency?

18    MR. JOHNIGAN: She has not established no residency here.

19    POLICE OFFICER: Sir, you need to shut your mouth right now.

20    MR. JOHNIGAN: Okay, bro, uh-huh.

21    POLICE OFFICER: If you are not going to come out here and talk please stay
      inside your room –

22

23    MR. JOHNIGAN: All right, bro.

24    POLICE OFFICE: -- so we can continue to talk to her. Do you understand that?

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR
SUMMARY JUDGMENT - 7

MR. JOHNIGAN: All right, bro. All right, bro.

POLICE OFFICER: You keep interrupting me.

MR. JOHNIGAN: All right, bro.

POLICE OFFICER: Please do not delay my investigation. Thank you. Do you live here? In order for me to take a report of damaged property I need to see that property.

MS. YOUNG: Okay. Well, let's see --

[The officers and Ms. Young walk into the apartment and pass the bedroom where the Plaintiff is recording.]

POLICE OFFICER: Where is the property at? Can you -- okay. So how did this happen?

MS. YOUNG: He was playing a game and I said turn the TV off and he told me if I turned the TV off he would damage my property. I asked him to please turn it off. I went to get my stuff and I turned the TV off. He said, yep, and then he punched --

POLICE OFFICER: What game was he playing?

MS. YOUNG: He unplugged his game.

POLICE OFFICER: Okay. So, there was a console connected up to here?

MS. YOUNG: Yeah, he unplugged it.

POLICE OFFICER: So, again explain to me why you wanted the TV off.

MS. YOUNG: Because I didn't want to – I asked him –

POLICE OFFICER: Okay. Jabo, so there's obviously a damaged TV so we have to talk to you about it.  What happened?  What is going on tonight man?

MR. JOHNIGAN:  Oh, man, I kindly don't want to talk about it just because there's like a lot of things that led up to what happened and, you know, I feel kind of like it was all a set-up kind of thing.  And I'm not violent, I'm not a violent person, but she kept provoking me.  And so that's why I did that to the TV and then I came back in here and I sat down.

POLICE OFFICER: Okay. Okay.

1

2

End of recording.

Dkt. 42, at 21-28.

3

4

Officer Hammond states that while the Plaintiff can be heard on the video "nuh, she

5

doesn't live here," he does not "recall hearing [the Plaintiff's] words at that time" because "he

6

was down the hallway" and he was "trying to focus on the words of Ms. Young, which unlike the

7

[Plaintiff] was not immediately next to the microphone." Dkt. 26, at 2-3. Further, he states that

8

he was not able to discern exactly what the Plaintiff was saying "only that he was repeating his

9

efforts to interrupt [him] speaking with Ms. Young" who he viewed as a "potential domestic

10

violence victim." *Id.*, at 3. Officer Hammond invited the Plaintiff to come to the door and speak

11

with them several times, or "keep it down" and the Plaintiff declined. *Id.* According to Officer

12

Hammond, at no time did the Plaintiff come to the front door and tell the officers that they were

13

not allowed in the apartment or try to physically prevent them from entering the apartment to

14

investigate. *Id.*

15

Officer Bohatch states that that "[a]lthough the audio [of Plaintiff's "no"] does come

16

through on the video, that was not the case when Officer Hammond and [he] were standing

17

outside the front door talking to Ms. Young." Dkt. 27, at 3. Officer Bohatch states that

18

"[t]hough we could hear [the Plaintiff] attempting to interrupt from down the hallway, [he does]

19

not recall clearly hearing what [the Plaintiff] was attempting to say, only that he kept trying to

20

interrupt Officer Hammond's attempt to converse with Ms. Young." Dkt. 27, at 3. He states that

21

his "primary focus was on statements being made by [Ms. Young] at the time, so [he] was not

22

focused on what [the Plaintiff] was saying." Dkt. 42, at 72. Officer Bohatch states that he

23

"certainly did not hear a definitive statement from him refusing consent to enter." Dkt. 27, at 3.

24

Ms. Young contends that one of the officers threatened to arrest her if she didn't let him in. Dkt. 25-2, at 18. She asserts that when the officer yelled at Jabo, "[d]o not impede my investigation," the officer's face was around one foot from hers. Dkt. 42, at 39. Ms. Young maintains that after he threatened to arrest her, she stepped back from the door and he came in. Dkt. 25-2, at 18.

Officer Bohatch acknowledges when he initially came to talk with the Plaintiff, his foot and hand "breached the threshold to [the Plaintiff's] bedroom" and that he did not have authority to do so. Dkt. 42, at 67-68. Officer Bohatch states that after his initial questions, he stepped back into the hall to talk with Officer Hammond and they decided to arrest the Plaintiff. Dkt. 42, at 71.

The Plaintiff doesn't remember what he and the Officer Bohatch said after the video stops, but, recalls that the Officer Hammond joined [Officer Bohatch] in the doorway of the Plaintiff's bedroom and told him that they were placing him under arrest. Dkt. 25-1, at 33-34. The Plaintiff maintains that he told the officers that the fight was over a cupcake and that the TV belonged to him multiple times. Dkt. 25-1, at 34. The Plaintiff acknowledges that "it wasn't a long conversation back and forth" – "less than a minute." Dkt. 25-1, at 35. The Plaintiff asserts that they did not read him his rights. Dkt. 25-1, at 38.

Ms. Young states that after the officers came in and started taking pictures, she decided she needed to tell them to leave. Dkt. 43, at 2. According to the Plaintiff, as the officers were walking him down the hall and out the door, they asked Ms. Young if they could take pictures of the TV and she said "no." Dkt. 42, at 14. He states that "that's when they tried to threaten her with, oh, if we can't do this – if we can't do something then you might be placed under arrest or something like that." *Id.*

Officer Bohatch acknowledges that while Officer Hammond was with the Plaintiff, Ms. Young withdrew her consent to allow them in the apartment. Dkt. 42, at 56-58. He maintains that it wasn't until they got into the apartment that whether she lived there was really called into question. Dkt. 42, at 56-57. In any event, Officer Bohatch states that he remained long enough to take a picture of the broken TV while Officer Hammond "was getting Jabo prepared to leave." Dkt. 42, at 58. Officer Bohatch warned Ms. Young not to interfere with their investigation by "her wanting to revoke consent now that Jabo was getting arrested, and basically denying the ability to prove that that crime ever happened." Dkt. 42, at 59. According to Officer Bohatch, she continued to yell at the officers, and he said, "[s]he was free to go since she didn't live in Jabo's apartment." Dkt. 42, at 61.

In Officer Bohatch's police report, he states that Ms. Young "stated that her ex-boyfriend and 'Baby-daddy' Jabo O. Johnigan got into an argument . . ." Dkt. 42, at 75. Ms. Young denied using the term "baby-daddy." Dkt. 43, at 2.

The Plaintiff was charged with third-degree malicious mischief domestic violence. Dkt. 25-6. Three months after Plaintiff's March arrest, Ms. Young write a note stating that she had given the TV to the Plaintiff in February as a gift. Dkt. 25-2, at 14 and 22. She claims that no one asked her to write the note, but that she did it because the Plaintiff "was going to court over the whole TV situation." *Id.*, at 14. She gave the note to Plaintiff and his lawyer. *Id.* Ms. Young states that she didn't want the Plaintiff to go to jail, just "to get a police report and have him replace the TV." *Id.* On October 23, 2019, the state moved for dismissal of the charges without prejudice because it cannot prove the charges beyond a reasonable doubt; the court granted the motion. Dkt. 25-8, at 2.

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR SUMMARY JUDGMENT - 11

1    The Plaintiff acknowledged that he did not sustain any physical injuries from the incident

2    and has not sought medical or mental health treatment.  Dkt. 25-1, at 10.  He diagnosed himself

3    with trauma.  *Id.*

4                    **II.    DISCUSSION**

5    **A.  SUMMARY JUDGMENT STANDARD**

6        Summary judgment is proper only if the pleadings, the discovery and disclosure materials on

7    file, and any affidavits show that there is no genuine issue as to any material fact and that the

8    movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a). The moving party is

9    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

10   showing on an essential element of a claim in the case on which the nonmoving party has the

11   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

12   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

13   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

14   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

15   metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is

16   sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

17   the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986);

18   *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.

19   1987).

20       The determination of the existence of a material fact is often a close question.  The court

21   must consider the substantive evidentiary burden that the nonmoving party must meet at, which

22   is a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.

23   Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

24

1   of the nonmoving party only when the facts specifically attested by that party contradict facts

2   specifically attested by the moving party.  The nonmoving party may not merely state that it will

3   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

4   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S.

5   242).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts"

6   will not be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

7   **B.  CLAIMS UNDER 42 U.S.C. § 1983 GENERALLY**

8   In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct

9   complained of was committed by a person acting under color of state law, and that (2) the

10   conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws

11   of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds,*

12   *Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an

13   alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769 F.2d 1350,

14   1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).  In order to state a claim under 42

15   U.S.C. § 1983, a plaintiff must set forth the specific factual bases upon which he claims each

16   defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

17   **C.  QUALIFIED IMMUNITY – GENERALLY**

18   Defendants in a Section 1983 action are entitled to qualified immunity from damages for

19   civil liability if their conduct does not violate clearly established statutory or constitutional rights

20   of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S. Ct. 808, 815

21   (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

22   In analyzing a qualified immunity defense, the Court must determine: (1) whether a

23   constitutional right would have been violated on the facts alleged, taken in the light most

24

ORDER ON DEFENDANTS CHRISTOPHER BOHATCH'S AND SCOTLAND HAMMON'S MOTION FOR
SUMMARY JUDGMENT - 13

1   favorable to the party asserting the injury; and (2) whether the right was clearly established when

2   viewed in the specific context of the case.  *Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001).  "The

3   relevant dispositive inquiry in determining whether a right is clearly established is whether it

4   would be clear to a reasonable officer that his conduct was unlawful in the situation he

5   confronted." *Id*.  This opinion will consider whether there has been a violation of each

6   constitutional right asserted here and then whether the officers are entitled to qualified immunity.

7   **D.  CLAIM FOR VIOLATION OF FOURTH AMENDMENT – SEARCH**

8      1.  Violation?

9   "Unreasonable searches and seizures" are prohibited under the Fourth Amendment.

10  Ordinarily, the Fourth Amendment prohibits the "warrantless entry of a person's home, whether

11  to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181

12  (1990).  "The prohibition does not apply, however, to situations in which voluntary consent has

13  been obtained, either from the individual whose property is searched, or from a third party who

14  possesses common authority over the premises." *Id.*  "Common authority rests on mutual use of

15  the property by persons generally having joint access or control for most purposes." *Id.*  Consent

16  is valid either from one who possess common authority, or from one who the police reasonably

17  believe has such authority, even if that belief is later shown to be erroneous. *Id., at 186.*

18     The Defendants here contend that even if Ms. Young did not have actual authority to consent

19  to the search, she had apparent authority to consent to the search.  "Under the apparent authority

20  doctrine, a search is valid if the government proves that the officers who conducted it reasonably

21  believed that the person from whom they obtained consent had the actual authority to grant that

22  consent." *United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir. 2013). "Apparent authority is

23  measured by an objective standard of reasonableness, and requires an examination of the actual

24

consent as well as the surrounding circumstances." *Id.*  Only those facts available to the officer at the moment are considered in assessing whether an officer's belief was objectively reasonable. *Rodriguez*, at 188.

The Defendants' motion for summary judgment on the Plaintiff's Fourth Amendment claim should be granted and the claim dismissed.  The Plaintiffs have failed to point to issues of fact that it was unreasonable for the officers on a domestic violence call to believe that, at a minimum, Ms. Young had apparent authority to consent to the officers entering the apartment. When the officers arrived on the scene, they were aware that Ms. Young called about a potential domestic violence offense, that she and the Plaintiff lived together, and that Officer Bohatch had been to that same address on another domestic violence call a few months before.  Although Ms. Young stated that she this was not her "technical place of residence," in response to the question "so who all lives here then if this technically isn't your apartment?" she answered, "me and him and our son."  Although the Plaintiff can be heard on the video saying "no" she doesn't live here, she then stated that all her possessions were in the apartment.

The Plaintiff argues that he expressly told the officers he could not enter.  The recording contains the following exchange:

POLICE OFFICER: So, can we come in and see that TV then?

MR. JOHNIGAN: No, she doesn't live here. She doesn't. She can't -- I did not.

The Plaintiff points to *Georgia v. Randolph,* 547 U.S. 103 (2006), which held that a warrantless search was unreasonable as to defendant who was physically present and expressly refused to consent.  In *Fernandez v. California,* 571 U.S. 292 (2014), the U.S. Supreme limited the *Randolph* holding.  It provided *Randolph* should be "taken at its word – that it applies only when the objector is standing in the door saying 'stay out' when officers propose to make a consent

1   search." *Fernandez,* at 306.  The Plaintiff fails to point to evidence that the officers heard him

2   expressly deny them access to the apartment.  While he arguably says "no" on the video, he is

3   not near the officers at the time, and they repeatedly say "what?" in response to his comments.

4   Both officers say that they did not hear him say "no" to whether they could enter.

5          Further, to the extent the Plaintiff now argues that Ms. Young only had apparent authority

6   to give her consent to search the common areas of the apartment (like where the TV was located

7   in the living room) and not to consent to entry into the Plaintiff's bedroom, the claim should still

8   be dismissed.  The grounds for this claim are less than clear.  To the extent the claim is based on

9   Officer Bohatch's foot and a portion of his arm crossing the threshold of the Plaintiff's bedroom

10  while they talked, there is no showing that this was an unreasonable search after hearing Ms.

11  Young describe the event and seeing the broken TV.  The Plaintiff was in the bedroom, which

12  had an open door, and did not object to the officers partially entering his bedroom.

13         The Plaintiff further maintains that Ms. Young's consent was not voluntary.  He points to

14  her statements that Ms. Young felt like she was being bullied and would be arrested if she didn't

15  let the officers in after they warned the Plaintiff not to impede their investigation.  The Plaintiff

16  fails to point to issues of fact that the officers knew that Ms. Young felt like that.  One of the

17  officers says, "In order for me to take a report of damaged property I need to see that property."

18  Ms. Young responds with, "Okay. Well, let's see –"  There is no evidence that a reasonable

19  officer in the Defendants' position would have known that her consent was not voluntary.

20         2.   Qualified Immunity?

21         Even if the Defendants violated the Plaintiff's Fourth Amendment right to be free from an

22  unreasonable search, the Defendants are entitled to qualified immunity for the search.  The

23  Plaintiff points to *Bonivert v. City of Clarkston,* 883 F.3d 865 (9th Cir. 2018) in arguing that his

24

Fourth Amendment rights were clearly established.  In *Bonivert,* the Ninth Circuit held that while a co-resident did not verbally tell the officers they could not enter the home, his express refusal was implied when he rushed to lock a side door to prevent the officer's entry and when he attempted to close a back door when the officers were trying to enter the home that way. *Bonivert* does not aid the Plaintiffs.  There is no evidence that the Plaintiff attempted to physically bar the officers from entering the apartment.  The Defendants motion for summary judgment on their claim for qualified immunity on the Fourth Amendment search claim should be granted.

**E.  CLAIM FOR VIOLATION OF FOURTH AMENDMENT – SEIZURE**

   1.  <u>Violation?</u>

  Generally, Fourth Amendment seizures are reasonable if supported by probable cause. *See Bailey v. U.S.*, 133 S.Ct. 1031, 1037 (2013).  Probable cause "arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed ... an offense."  *Crowe v. Cty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010). )).  "Probable cause is an objective standard.  The arresting officers' subjective intention . . . is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes."  *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007).

  The Defendants' motion for summary judgment on the Plaintiff's Fourth Amendment seizure claim should be granted and the claim dismissed.  The Plaintiff has failed to point to issues of fact as to this claim.  After hearing Ms. Young's version of events and seeing the damage to the TV, there are no facts to suggest that the officers did not have probable cause to arrest the Plaintiff for malicious mischief under RCW 9A.48.090(1)(a).  The Plaintiff asserts that the evidence gathered after the officers entered the apartment should be excluded and so there is no

probable cause for arrest.  The exclusionary rule, applicable in criminal cases and prohibiting the government from introducing illegally seized evidence against a defendant, does not apply in cases brought under 42 U.S.C. § 1983.  *Lingo v. City of Salem,* 832 F.3d 953, 958-959 (9th Cir. 2016).

To the extent that the Plaintiff also asserts that he was "seized" when the officers ordered him to his bedroom, the claim should also be dismissed.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007)(*internal quotation marks and citations omitted*).  The Plaintiff fails to point to sufficient evidence to support his assertion that he did not feel free to go when the officers were outside his apartment asking him to remain in his bedroom while they talked to Ms. Young at the door.  Further, the Defendants point out that the Plaintiff did not make this claim in his complaint.  Additionally, they maintain that they had probable cause to arrest him for his repeated attempts to interfere with a domestic violence investigation under RCW 9A.76.020(1).

### 2.  Qualified Immunity?

"Even if the arrest was made without a warrant and without probable cause, however, the officer may still be immune from suit if it was objectively reasonable for [them] to believe that [they] had probable cause." *Rosenbaum v. Washoe Cty*., 663 F.3d 1071, 1078 (9th Cir. 2011).  "The law acknowledges that an otherwise competent officer will sometimes make an unreasonable decision or make an unreasonable mistake as to law or fact. In those instances, the officer will appropriately be liable under § 1983." *Id.*  "Framing the reasonableness question

1    somewhat differently, the question in determining whether qualified immunity applies is whether

2    all reasonable officers would agree that there was no probable cause in this instance." *Id.*

3         Even if the Defendants violated the Plaintiff's Fourth Amendment right to be free from

4    unreasonable seizures, they are entitled to qualified immunity on this claim.  The Plaintiff fails to

5    point to a case which is sufficiently similar to put these officers on notice that they were

6    violating his clearly established rights.  They have failed to show that "all reasonable officers

7    would agree that there was no probable cause" here.

8    **F. CLAIM FOR VIOLATION OF FOURTEENTH AMENDMENT – RACE**

9         1. <u>Violation?</u>

10        To make a 42 U.S.C. § 1983 claim "for a violation of the Equal Protection Clause of the

11   Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose

12   to discriminate against the plaintiff based upon membership in a protected class." *Furnace v.*

13   *Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013)(*internal quotation marks and citation omitted*).  A

14   plaintiff must point to "intentional unlawful discrimination" or "facts that are at least susceptible

15   of an inference of discriminatory intent." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d

16   1022, 1026 (9th Cir. 1998). "[A] plaintiff must show that the defendant treated the plaintiff

17   differently from similarly situated individuals" to assert an equal protection claim. *Pimentel v.*

18   *Dreyfus*, 670 F.3d 1096, 1106 (9th Cir. 2012).

19        The Plaintiff's claim for violation of the Fourteenth Amendment should be dismissed.  As

20   evidence that the defendants acted with an intent or purpose to discriminate against him, the

21   Plaintiff points to inconsistencies in the police reports, internal investigation transcripts and the

22   video Plaintiff created.  He maintains that substantial inconsistencies implicates credibility

23   leading to an inference of discrimination.

24

1    To the extent that the Plaintiff generally asserts that there are inconsistencies creating

2    credibility issues with Officer Hammond's or Officer Bohatch's police reports, the transcripts

3    from the police department's internal investigation, and the video made by the Plaintiff, he fails

4    to point out what is inconsistent and why it is relevant.  A review of these materials do not lead

5    to the conclusion that any inconsistencies are so "substantial" to lead to an inference of

6    discrimination.

7    The Plaintiff fails to point to any other evidence that Officer Hammond "acted with an intent

8    or purpose to discriminate against [him]" based on his race.  Plaintiff's subjective belief that the

9    officers were motivated by discriminatory animus, without more, is insufficient.  *See Gomez v.*

10   *City of Fremont,* 730 F. Supp.2d 1056 (N.D. Cal. 2010).

11   As evidence of Officer Bohatch's discriminatory bias, the Plaintiff points to Officer

12   Bohatch's use of the term "Baby-daddy" in his police report.  He cites an article written in 2020

13   (after this event) which indicates that use of the term reinforces racial stereotypes.  The

14   Plaintiff's Equal Protection claim against Officer Bohatch should also be dismissed even if this

15   could be considered evidence of discriminatory bias. He fails to point to any evidence that

16   Officer Bohatch "treated the plaintiff differently from similarly situated individuals." *Pimentel,*

17   at 1106.

18   The Plaintiff has failed to point to issues of fact to support his equal protection claim.

19       2.  <u>Qualified Immunity?</u>

20   Further, even if the officers had violated his equal protection rights, they are entitled to

21   qualified immunity on that claim.  The Plaintiff fails to cite to a case that demonstrates that it

22   was clearly established that it would be clear to a reasonable officer that his conduct was

23   unlawful in the situation he confronted.

24

**G. CLAIM FOR VIOLATION OF FIFTH AMENDMENT – INTERROGATION**

The Plaintiff asserts a claim for violation of his Fifth Amendment right against self-incrimination.  The Fifth Amendment is incorporated into the Fourteenth Amendment's due process clause and so, applies here.  *See Dickerson v. U.S.,* 530 U.S. 428, 434 (2000).

The Defendants' motion for summary judgment on the Plaintiffs' Fifth Amendment claim (Dkt. 24) should be granted.  The Plaintiffs do not respond to the motion as to this claim and the motion has merit.

**H. STATE LAW CLAIMS**

The Plaintiff asserts state law claims for outrage and for nuisance.

1. Outrage

In Washington, "[t]he tort of outrage requires the proof of three elements:  (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress."  *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003).

The Defendants' motion for summary judgment on the Plaintiffs' outrage claim should be granted.  The Plaintiffs did not respond to this portion of the motion.  They failed to point to sufficient issues of fact to find that the officers' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel*, at 196.  The outrage claim should be dismissed.

2. Nuisance

A nuisance is defined by Washington statute as:

[U]nlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or

basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.

RCW 7.48.120.  Under Washington law, "an actionable nuisance must either injure the property or unreasonably interfere with enjoyment of the property." *Tiegs v. Watts*, 135 Wn.2d 1, 13 (1998).

The motion for summary judgment on the Plaintiff's nuisance claim should be granted.  The Plaintiff does not assert that the officers injured his property, but that his arrest was an unreasonable interference with his enjoyment of his apartment.  The Plaintiff notes that the Defendants concede that their entry into the apartment might have violated the Washington State Constitution and so that renders their interference "unreasonable."  The Defendants properly point out that Washington does not recognize a private right of action based on the Washington State Constitution, and the Plaintiff's attempt to create one should be rejected.  This claim should be dismissed.

## III.   ORDER

It is **ORDERED** that Defendants Christopher Bohatch and Scotland Hammond's Motion for Summary Judgment (Dkt. 24) **IS GRANTED** and the claims against them are **DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 2nd day of August, 2021.

ROBERT J. BRYAN
United States District Judge